**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 25-1375**

---

JESSE NEAR, as Personal Representative of the Estate of Douglas Larry Belger,

Plaintiff - Appellant,

v.

ENERCO GROUP, INC., d/b/a Mr. Heater,

Defendant - Appellee.

---

Appeal from the United States District Court for the South Carolina, at Columbia.  The Honorable Sherri A. Lydon, District Judge.  (3:23-cv-03483-SAL)

---

Argued:  December 9, 2025                    Decided:  July 17, 2026

---

Before BENJAMIN and BERNER, Circuit Judges, and John A. GIBNEY, Jr., Senior United States District Judge for the Eastern District of Virginia, sitting by designation.

---

Affirmed in part and question certified to the Supreme Court of South Carolina by published opinion and order.  Judge Benjamin wrote the opinion and directed entry of the order, in which Judge Berner and Judge Gibney joined.

---

**ARGUED:**  Christopher Moore, RICHARDSON THOMAS LLC, Columbia, South Carolina, for Appellant.  Edward Raymond Moore, III, MURPHY & GRANTLAND, PA, Columbia, South Carolina; Scott Risk Schillings, HINKLE LAW FIRM LLC, Wichita, Kansas, for Appellee.  **ON BRIEF:**  Santino U. Ambrosini, MURPHY & GRANTLAND, PA, Columbia, South Carolina, for Appellee.

---

DEANDREA GIST BENJAMIN, Circuit Judge:

Decedent Doug Belger died after suffering extensive burn injuries when his clothing was allegedly ignited by a propane tank top heater made by defendant Enerco Group, Inc. Plaintiff Jesse Near, as personal representative of Belger's estate, filed this wrongful death suit asserting the design of the heater was defective. Near claimed that the heater was defectively designed because it lacked an adequate guard or other feasible alternative design that would have prevented clothing from igniting when a user came too close to the heater. Near did not assert a separate failure to warn or warnings defect claim.

The heater's warnings nevertheless were central to the parties' dispute. Enerco argued that the warnings accompanying the heater, if adequate, rendered the product nondefective under South Carolina law. Near disputed that legal premise and moved to certify to the Supreme Court of South Carolina the question whether adequate warnings preclude a design defect claim. The district court declined to certify the question and held that an adequate warning does preclude a design defect claim under South Carolina law.

Separately, the district court excluded Near's expert witness whose opinions addressed the adequacy of the heater's warnings. Without that expert testimony, the district court concluded that Near lacked admissible evidence from which a jury could find the warnings inadequate and therefore found the warnings adequate as a matter of law.

After concluding that adequate warnings preclude a design defect claim under South Carolina law and finding that the heater's warnings were adequate as a matter of law, the court granted summary judgment to Enerco on Near's design defect claim.

2

Near now appeals those three decisions. He argues that the district court erred by denying certification, excluding his expert witness, and ultimately granting summary judgment to Enerco on his design defect claim.

For the reasons below, we certify to the Supreme Court of South Carolina the question whether adequate warnings preclude a design defect claim under South Carolina law, affirm the district court's exclusion of Near's expert witness, and defer consideration of the district court's grant of summary judgment.

## I. Background

### A. Belger's Injuries

On a very cold day in late December, Belger and his nephew, Keith McCullough, were working in McCullough's workshop. Because of the low temperature, McCullough turned on his portable propane tank top heater while they worked, and both men would periodically stand near the heater to warm themselves. Belger was wearing a plaid brown shirt, long john undershirt, a jacket that was 100% cotton, and pants that were a blend of 60% cotton, 36% nylon, and 4% elastane.

At some point, McCullough left the workshop to collect wood so that he could demonstrate his new wood splitter for his uncle. McCullough was gone less than a minute. As he returned, Belger ran out of the workshop with his clothes on fire. McCullough did not witness the ignition but later testified that Belger may have backed into or otherwise came too close to the heater.

3

Belger was taken to a burn center where he was treated for burns to approximately thirteen percent of his body, including burns to his back, buttocks, lower back, and lower legs. He died during recovery.

## B. The Heater

The heater at issue is an Enerco "Mr. Heater" Model MH15T propane tank top heater. The heater attaches directly to the valve of a standard twenty-pound propane cylinder, like the type commonly used with gas grills. To operate it, the user opens the propane valve and lights the heater's burners with a match or lighter. The heater uses infrared burners, meaning the burner surface glows bright orange and produces radiant infrared heat, but no flames protrude from the burner's face. The heater has a metal wire guard in front of the burner and a reflector shield behind and around the burner assembly. The heater also makes an audible sound during operation and produces substantial radiant heat that can be felt by nearby users.

Here is an example of an operating Model MH15T heater attached to a twenty-pound propane cylinder:



4

### C. Warnings and Instructions Provided with the Heater

The heater was sold with warnings and instructions in several locations, including on the product packaging, on a removable hangtag, in the owner's manual, and on the heater itself.

The product packaging instructed users to read and keep the owner's manual and to follow all safety requirements and operating instructions.

The removable hangtag stated that only people who can understand and follow the instructions should use or service the heater. It also identified minimum clearances from combustible materials: thirty-six inches from the top and front of the heater and twenty-four inches from the sides, rear, and floor. The hangtag warned of fire, burn, inhalation, and explosion hazards and instructed users to keep combustible materials a safe distance from the heater. It further warned that failure to comply with the heater's precautions and instructions could result in death, serious bodily injury, or property loss from fire, explosion, burn, asphyxiation, carbon-monoxide poisoning, or electrical shock.

The owner's manual contained similar warnings. It warned that failure to follow the manual could result in fire or explosion causing property damage, personal injury, or death. It stated that only people able to understand and follow the instructions should use or service the heater. It warned users never to touch the heater while it was operating. In the section addressing minimum clearances, the manual stated that the heater's surface can become extremely hot during operation and directed users to keep sleeping bags, clothing, and all combustible materials clear of the heater. The manual specifically instructed users

5

never to allow clothing, tents, or other combustible materials within thirty inches of the heater face and to keep the heater at least twenty-four inches above floor level during use.

On the heater itself, the word "HOT" was stamped into the reflector shield.

### D. Procedural History

Near, as personal representative of Belger's estate, filed this action against Enerco. The complaint asserted product liability claims under South Carolina law based on an alleged design defect in the heater. Near's design theory was that the heater should have incorporated an adequate guard or alternative design that was sufficient to prevent clothing from igniting when a person came into close proximity to the heater. Near did not pursue a separate failure to warn or warnings-defect claim.

After discovery, Enerco filed two motions relevant to this appeal: a motion to exclude Near's human factors expert, Dr. Nancy Grugle, and a motion for summary judgment. In the motion to exclude Grugle, Enerco argued that she was not qualified to render opinions on the adequacy of warnings for the heater and that she had not used a reliable methodology in reaching her conclusion. Enerco focused on her lack of experience with propane heaters, her failure to physically inspect or operate the heater, her lack of testing concerning user perception, and her failure to identify a specific alternative warning or causation opinion. In the motion for summary judgment, Enerco argued that South Carolina law treats an adequate warning as curing or precluding a design defect claim. Enerco argued that because the heater came with warnings that, if followed, would have prevented Belger's clothing from igniting, the heater could not be considered defectively designed or unreasonably dangerous as a matter of law.

6

Near opposed Enerco's motions. On summary judgment, Near argued that this was a design defect case, not a warnings defect case, and that South Carolina law does not require a design defect plaintiff to prove inadequate warnings as an element of the claim. Near contended that warnings cannot replace a reasonably safe design and that the case should be governed by South Carolina's risk utility design defect framework.

At the same time, Near moved to certify a question to the Supreme Court of South Carolina under Rule 244 of the South Carolina Appellate Court Rules. The proposed certified question concerned whether, under South Carolina law, the existence of an adequate warning precludes a design defect claim as a matter of law. Near argued that this was a novel and dispositive question of South Carolina law because the Supreme Court of South Carolina had not resolved the issue after *Branham v. Ford Motor Co.*, 701 S.E.2d 5 (S.C. 2010), where the court moved away from the traditional consumer expectations test and officially adopted a risk utility framework for design defect claims.

The district court granted Enerco's motion to exclude Grugle, denied Near's motion to certify, and granted Enerco's motion for summary judgment. *Near v. Enerco Group, Inc.*, No. 3:23-cv-3483-SAL, 2025 WL 1865224, at *1 (D.S.C. March 25, 2025).

As to the motion to exclude Grugle, the district court granted Enerco's motion. *Id.* at *9. After stating that it had "serious reservations" about whether Grugle was qualified to give expert testimony on the adequacy of the warnings, the district court assumed for purposes of the motion that Grugle was qualified. *Id.* at *6. The court then excluded Grugle's opinions on reliability grounds, concluding that she did not employ a reliable

7

methodology in reaching her warning opinions, as required by Fed. R. Evid. 702. *Id.* at *6–9.

As to certification, the district court denied Near's motion to certify whether, under South Carolina law, the existence of adequate warnings precludes a design defect claim. *Id.* at *14. The district court found that it was bound by this court's decision in *Hickerson v. Yamaha Motor Corp.*, 882 F.3d 476 (4th Cir. 2018). The court there looked to South Carolina intermediate court decisions and held that adequate warnings do preclude design defect claims under South Carolina law. *Id.* at *9, 13. The district court rejected Near's argument that *Branham*, a decision issued eight years before *Hickerson*, provided reason to think the Supreme Court of South Carolina might rule differently. *Id.* at *12–13. Accordingly, the district court accepted Enerco's legal argument and found that an adequate warning can preclude a design defect claim under South Carolina law. *Id.* at *13.

As for summary judgment, the district court granted summary judgment for Enerco based on the state law ruling regarding warnings and its exclusion of Grugle's warning opinions. *Id.* at *13–14. After excluding Grugle, the district court found that Near had "failed to offer admissible evidence—whether through expert testimony or otherwise—challenging the adequacy of the product warnings." *Id.* at *13. The court therefore treated the warnings as adequate as a matter of law. *Id.* And because *Hickerson* precludes a design defect claim in the presence of adequate warnings, the district court concluded that it "need not address whether a design defect existed in this case." *Id.*

Near now appeals the district court's order. Near argues that the district court erred in not certifying the question to the Supreme Court of South Carolina, that the district court

8

erred in excluding Grugle's opinions, and that the district court erred in granting Enerco's motion for summary judgment. We address those decisions in turn below.

## II. Certified Question to the Supreme Court of South Carolina

Near asks us to certify the following question to the Supreme Court of South Carolina pursuant to South Carolina Appellate Court Rule 244(a): Do adequate product warnings preclude a design defect claim as a matter of South Carolina law?

We address Near's request in three parts. First, we review relevant South Carolina design defect law. Second, we apply the governing certification standards, including South Carolina Appellate Court Rule 244(a), and explain why certification is appropriate here. In doing so, we explain that we are not disregarding *Hickerson* but are instead certifying a question that *Hickerson* itself recognized the Supreme Court of South Carolina had not yet answered. Third, we certify the question.

## A. South Carolina Design Defect Law

The question Near seeks to certify arises from the interaction between § 402A of the Restatement (Second) of Torts; South Carolina's adoption of that section and its comments as legislative intent; the development of South Carolina design defect caselaw from *Claytor v. General Motors Corp.*, 286 S.E.2d 129 (S.C. 1982), to *Branham v. Ford Motor Co.*, 701 S.E.2d 5 (S.C. 2010); and this court's interpretation of South Carolina law in *Hickerson v. Yamaha Motor Corp.*, 882 F.3d 476 (4th Cir. 2018).

In 1965, the American Law Institute adopted § 402A in the Restatement (Second) of Torts. Section 402A states a general rule of strict liability for a seller who sells "any

9

product in a defective condition unreasonably dangerous to the user or consumer." Restatement (Second) of Torts § 402A(1). Section 402A did not separately define manufacturing defects, design defects, and warning defects, which are now recognized as distinct theories of products liability. *Compare id., with* Restatement (Third) of Torts: Products Liability § 2 (defining manufacturing defects, design defects, and warning defects as three independent categories of product defects). Instead, it used the general phrase "defective condition unreasonably dangerous" as the standard for all strict products liability claims. *See* Restatement (Second) of Torts § 402A(1).

Two comments to § 402A are particularly relevant here. Comment i explains when a product is "unreasonably dangerous" and is commonly associated with the consumer expectations test, one of two major tests for determining whether a product is defective. *See Young v. Tide Craft, Inc.*, 242 S.E.2d 671, 679 (S.C. 1978) (quoting from comment i to express the consumer expectations test); *see also* Jerry J. Phillips, *Consumer Expectations*, 53 S.C. L. Rev. 1047, 1047 (2002) (noting that comments g and i form the consumer expectations test). Under the consumer expectations test, a product is defective if it "is unreasonably dangerous to the consumer or user given the conditions and circumstances that foreseeably attend use of the product." *Claytor*, 286 S.E.2d at 131.

Comment j addresses warnings and states that "[w]here warning is given, the seller may reasonably assume that it will be read and heeded," and that "a product bearing such a warning, which is safe for use if it is followed, is not in defective condition, nor is it unreasonably dangerous." Restatement (Second) of Torts § 402A cmt. j. Read broadly, the comment suggests that an adequate warning can render a product not defective and not

10

unreasonably dangerous.  David G. Owen, *The Puzzle of Comment j*, 55 Hastings L. J. 1377, 1377 (2004) ("[C]omment j[] can be read quite literally to mean that the provision of a warning—any type of warning, no matter how deficient—eliminates the manufacturer's duty of safe design.").

In 1976, the South Carolina General Assembly adopted § 402A as part of South Carolina's Defective Products Act.  *See* S.C. CODE ANN. §§ 15-73-10 to -30 (1976).  The General Assembly also provided that the comments to § 402A "are incorporated herein by reference thereto as the legislative intent of this chapter."  *Id.* § 15-73-30.

The Supreme Court of South Carolina first addressed design defect principles in this statutory setting in *Claytor v. General Motors Corp.*, 286 S.E.2d 129 (S.C. 1982).  *Claytor* arose from an automobile accident involving a 1975 Oldsmobile manufactured by General Motors.  *Id.* at 130.  The plaintiffs alleged that a wheel separated from the Oldsmobile after the lug bolts connecting the wheel to the vehicle cracked and broke, causing the vehicle to cross into oncoming traffic.  *Id.*  The wheels on the Oldsmobile had been rotated by a local dealership several months before the accident.  *Id.*  General Motors' service manual specified that the lug nuts should be tightened with approximately 85 pounds of pressure but did not mention that excessive force to a nut could crack the bolt.  *Id.* at 132.  Based on these facts, plaintiffs asserted products liability claims against General Motors, alleging that General Motors defectively designed the lug bolts and failed to warn that overtightening the lug nuts could cause the bolts to crack or break.  *Id.*

The Supreme Court of South Carolina affirmed a directed verdict for General Motors.  *Id.*  After setting out the governing standard, the court stated that the plaintiffs'

11

evidence raised two jury issues: "(1) was the design of the lug bolts faulty? and (2) was there insufficient warning relative to the effect of overtightening the lug nuts." *Id.* at 130. The court held that the evidence did not permit a finding that the lug bolts were defective when they left the General Motors plant and that General Motors had no duty to warn that excessive tightening could damage the lug nuts or bolts because that danger was common knowledge, particularly to an automobile mechanic.[1] *Id.* at 132.

In explaining defectiveness and reaching its holding, *Claytor* referred to both the consumer expectations test and the other major defect test, the risk utility test. *Id.* at 131. For consumer expectations, it stated that "[t]he test of whether a product is or is not defective is whether the product is unreasonably dangerous to the consumer or user given the conditions and circumstances that foreseeably attend use of the product." *Id.* (citing *Kennedy v. Custom Ice Equip. Co.*, 246 S.E.2d 176 (S.C. 1978)). For risk utility, it stated that, in determining whether a product is unreasonably dangerous, "numerous factors must be considered," including "the usefulness and desirability of the product, the cost involved for added safety, the likelihood and potential seriousness of injury, and the obviousness of danger." *Id.* at 132.

*Claytor* also included language about adequate warnings, stating that inherently dangerous products, "[i]f properly prepared, manufactured, packaged and accompanied with adequate warnings and instructions, . . . cannot be said to be defective." *Id.* But the

---

[1] Chief Justice Lewis dissented. *Claytor*, 286 S.E.2d at 133–35 (Lewis, C.J., dissenting). The dissent would have allowed both plaintiffs design theory and their warning theory to proceed to the jury. *Id.*

court did not apply that language by treating the manual's torque specification as an adequate warning that defeated an otherwise viable design defect claim. *Id.* Additionally, the court did not hold an existing warning was legally adequate, did not decide whether an adequate warning precludes a design defect claim, and did not refer to comment j. *See id.*

In the years following *Claytor*, the South Carolina Court of Appeals explicitly cited and applied comment j in several cases.

*Anderson v. Green Bull, Inc.*, 471 S.E.2d 708 (S.C. Ct. App. 1996), involved a products liability claim arising from a roofer's electrocution while moving an aluminum ladder near overhead power lines. The ladder contained a warning instructing users to keep the unit clear of utility and electrical wiring. *Id.* at 710. The South Carolina Court of Appeals cited comment j and stated that "[a] product bearing a warning that the product is safe for use if the user follows the warning is neither defective nor unreasonably dangerous." *Id.* But the court ultimately held that the manufacturer had no duty to warn users because the danger of using an aluminum ladder near overhead power lines was generally known and recognized. *Id.* at 710–11.

*Allen v. Long Mfg. NC, Inc.*, 505 S.E.2d 354 (S.C. Ct. App. 1998), *cert. denied* (May 28, 1999), involved a portable grain auger that upended and fatally injured a user. The auger contained a warning that instructed users to support the discharge end or anchor the intake to prevent upending. *Id.* at 355–56. The trial court granted summary judgment for the manufacturer, but the South Carolina Court of Appeals reversed because factual issues remained concerning the legal adequacy of the warning and proximate cause. *Id.* at 359–60. In explaining the governing law, the court stated that "South Carolina law does not

13

require that a manufacturer refine a product which is made safe for use by an adequate warning so that the product does not need a warning to be safe." *Id.* at 359 (citing Restatement (Second) of Torts § 402A cmt. j.).

*Curcio v. Caterpillar, Inc.*, 543 S.E.2d 264 (S.C. Ct. App. 2001), *rev'd on other grounds*, 585 S.E.2d 272 (2003), involved a mechanic who was crushed while servicing a Caterpillar track loader. The South Carolina Court of Appeals held that the warnings accompanying the loader were adequate as a matter of law and prevented the product from being unreasonably dangerous. *Id.* at 269–70. The court stated that "a product is not unreasonably dangerous if accompanied by adequate warnings that, if followed, make the product safe for use." *Id.* at 269.

The Supreme Court of South Carolina next addressed the governing test for design defect claims in *Branham v. Ford Motor Co.*, 701 S.E.2d 5 (S.C. 2010). *Branham* involved a 1987 Ford Bronco II. *Id.* at 7–8. The plaintiff, a child passenger, was injured when the driver lost control of the vehicle, overcorrected, and the vehicle rolled over. *Id.* at 8. The plaintiff asserted product liability claims against Ford, including a design defect theory based on the Bronco II's handling and stability and its alleged tendency to roll over. *Id.* at 10. Ford argued that the court should apply the risk utility test with its requirement of showing a reasonable alternative design, rather than the traditional consumer expectations test. *Id.* at 13.

The Supreme Court of South Carolina agreed with Ford and formally announced that "the exclusive test in a products liability design case is the risk-utility test with its requirement of showing a feasible alternative design." *Id.* at 14. The court began by

14

acknowledging that South Carolina had traditionally employed both the consumer expectations test and the risk utility test to determine whether a product was unreasonably dangerous because of a design defect. *Id.* at 13. It traced the consumer expectations formulation to *Claytor*'s statements that the question for design defect claims is whether the product is unreasonably dangerous to the consumer or user under the conditions and circumstances that foreseeably attend its use. *Id.* It also traced the risk utility approach to *Claytor*'s list of factors, including usefulness, cost of added safety, likelihood and seriousness of injury, and obviousness of danger. *Id.*

*Branham* then made a doctrinal choice, reasoning that "in design defect cases the risk-utility test provides the best means for analyzing whether a product is designed defectively." *Id.* at 15. The court explained that the consumer expectations test was ill-suited for design defect cases because it focused on the consumer rather than on the allegedly defective product. *Id.* By contrast, the court found the risk utility test supplies objective factors for the trier of fact to analyze when considering a manufacturer's design choice. *Id.*

In making this doctrinal choice, the court recognized that the General Assembly had adopted § 402A and identified its comments as legislative intent. *Id.* at 14. The court also recognized that the comments in § 402A are the basis for the consumer expectations test. *Id.* The court then noted that, since the adoption of § 402A, the American Law Institute published the Restatement (Third) of Torts: Products Liability, which effectively moved away from the consumer expectations test for design defects and towards a risk utility test. *Id.* The court found the General Assembly's "foresight in looking to the American Law

15

Institute for guidance in this area [as] instructive" and stated that the General Assembly had "expressed no intention to foreclose court consideration of developments in products liability law." *Id.* Ultimately, the court found that adopting the risk utility test for design defect cases did not infringe on the General Assembly's role in the area. *Id.*

Our court later addressed the relationship between adequate warnings and design defect liability under South Carolina law in *Hickerson v. Yamaha Motor Corp.*, 882 F.3d 476 (4th Cir. 2018). *Hickerson* involved injuries sustained from falling into the jet thrust of a personal watercraft. 882 F.3d at 478. The watercraft bore on-product warnings, repeated in the operator's manual, instructing riders to wear protective clothing to avoid internal injuries from water forced into body cavities. *Id.* at 478–79. The plaintiff did not wear the recommended protective clothing and admitted that she did not read the warnings. *Id.* at 479. The district court excluded the plaintiff's warnings expert, found no admissible evidence that the warnings were inadequate, treated the warnings as adequate as a matter of law, and entered summary judgment for Yamaha on the warning and design defect claims. *Id.* at 479–80.

On appeal, the parties' core disagreement was whether defective design claims are defeated when product warnings are deemed legally adequate or, in other words, whether comment j to § 402A applies. *Id.* at 483. The plaintiff argued that design defect claims are independent of warning defect claims and that adequate warnings should not defeat design defect liability. *Id.* Yamaha responded that comment j's text and the South Carolina Court of Appeals cases applying it allowed a manufacturer to avoid liability for an alleged design defect when the product carried an adequate warning. *Id.*

16

This court agreed with Yamaha and applied comment j. *Id.* at 484. The court first recognized that its role was to apply South Carolina law. *Id.* at 483. It also recognized that South Carolina's Defective Products Act codified § 402A and incorporated the comments to § 402A as legislative intent, and that the Supreme Court of South Carolina had not applied comment j to the precise question whether adequate warnings preclude a design defect claim. *Id.* Because there was no controlling decision from the state's highest court, this court looked to decisions of the South Carolina Court of Appeals and noted that *Anderson*, *Allen*, and *Curcio* had applied comment j's plain language to confirm that adequate warnings may "cure" alleged design defects. *Id.* at 484. Finding that there was no "persuasive data" that the Supreme Court of South Carolina would rule differently from those South Carolina Court of Appeals opinions, this court held that adequate warnings preclude design defect liability. *Id.*

Notably, *Hickerson* did not address *Branham*, which issued after the South Carolina Court of Appeals decisions applying comment j. Specifically, this court did not consider *Branham*'s adoption of the risk-utility test as the exclusive test for design defect claims or *Branham*'s reasoning that South Carolina courts may consider developments in products liability law even after § 402A's codification.

### B. Certification Standards and Application

Federal courts sitting in diversity must apply state substantive law. *Erie R.R. v. Tompkins*, 304 U.S. 64, 67 (1938). When the state's highest court has resolved the relevant question, that decision supplies the rule of decision. *United States v. Little*, 52 F.3d 495, 498 (4th Cir. 1995) ("The simplest way to discern state law is to follow a state statute or a

17

decision by the highest court of the state."). When the state's highest court has not answered the precise question presented, the federal court generally must predict how that court would rule. *See Roe v. Doe*, 28 F.3d 404, 407 (4th Cir. 1994). Courts often describe that predictive task as an *Erie* guess or *Erie* prediction. *See, e.g.*, *Priority 1 Auto. Grp., Inc. v. CDK Glob., LLC*, 2025 WL 2319659, at *3 (4th Cir. Aug. 12, 2025); *PETA, Inc. v. N.C. Farm Bureau Fed.*, 60 F.4th 815, 825 (4th Cir. 2023); *Brunenkant v. Suburban Hospital, Inc.*, 176 F.4th 329, 333 (4th Cir. 2026).

In making an *Erie* guess, federal courts may not disregard a state intermediate appellate decision simply because it would read state law differently. *See Little*, 52 F.3d at 498 ("We know of no rule that allows the district judge to make a 'corroborating' finding when there is an opinion of the second highest court in the state directly on point."). Rather, when the state's highest court has not indicated how it would decide an issue, the federal court generally follows the state's intermediate appellate court unless there is "persuasive data" that the state's highest court would decide otherwise. *Id.* That rule treats state intermediate appellate decisions as important evidence of state law which may not be disregarded by a federal court. *Id.* At the same time, the state's intermediate appellate decisions are just part of the predictive inquiry into how the state's highest court would rule; they are not themselves controlling decisions from the state's highest court. *See id.* (referring to state intermediate appellate decisions as "datum for ascertaining state law").

Another way federal courts address unresolved questions of state law is through state certification procedures. *Arizonans for Off. Eng. v. Arizona*, 520 U.S. 43, 79 (1997); *Lehman Bros. v. Schein*, 416 U.S. 386, 394 (1974) (Rehnquist, J., concurring) ("State

18

certification procedures are a very desirable means by which a federal court may ascertain an undecided point of state law."). Certification provides a discretionary mechanism for obtaining an authoritative answer from the state's highest court. *Lehman Bros.*, 416 U.S. at 391. When appropriate, certification may "save time, energy, and resources and helps build a cooperative judicial federalism." *Id.* Certification may also help the federal court avoid "gratuitous" speculation about unresolved state law questions. *See Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 510 (1985) (O'Connor, J., concurring) ("Speculation by a federal court about the meaning of a state statute in the absence of prior state court adjudication is particularly gratuitous when, as is the case here, the state courts stand willing to address questions of state law on certification from a federal court."). At the same time, certification likely "entails more delay and expense than would an ordinary decision of the state question on the merits by the federal court." *Lehman Bros.*, 416 U.S. at 394 (Rehnquist, J., concurring). We therefore have instructed courts to certify questions to a state's highest court "[o]nly if the available state law is clearly insufficient." *Roe*, 28 F.3d at 407 (citing *Smith v. FCX, Inc.*, 744 F.2d 1378, 1379 (4th Cir. 1984), *cert. denied*, 471 U.S. 1103 (1985)); *Thompson v. Ciox Health, LLC*, 52 F.4th 171, 173 (4th Cir. 2022).

South Carolina Appellate Court Rule 244(a) provides the certification mechanism here: "The Supreme Court [of South Carolina] in its discretion may answer questions of law certified to it by any federal court of the United States . . . when requested by the certifying court if there are involved in any proceeding before that court questions of law of this state which may be determinative of the cause then pending in the certifying court

19

when it appears to the certifying court there is no controlling precedent in the decisions of the Supreme Court [of South Carolina]." S.C. App. Ct. R. 244(a).

With these principles in mind, we find that certification is appropriate here because (1) the certified question may be determinative of the appeal, (2) there is no controlling precedent from the Supreme Court of South Carolina answering the certified question, and (3) the available state law is not sufficient for us to resolve the question without certification.

### 1. Determinative Question

The district court's summary judgment ruling turned on the answer to the certified question. *Near*, 2025 WL 1865224, at *13–14. After excluding Near's warning expert, the district court concluded that Near lacked admissible evidence to dispute the adequacy of the heater's warnings and therefore treated the warnings as adequate as a matter of law. *Id.* The district court then applied the rule from *Hickerson* that adequate warnings preclude a design defect claim under South Carolina law and held that the heater's adequate warnings precluded Near's design defect claim. *Id.*

The district court's rationale makes the certified question "determinative" under Rule 244(a). The district court's decision rested on the proposition that legally adequate warnings defeat a design defect claim under South Carolina law. If that proposition is correct, the district court properly treated the heater's adequate warning as precluding Near's design defect claim. If it is incorrect, the district court could not grant summary judgment on the design defect claim merely because it found the heater's warnings adequate.

20

## 2. No Controlling Supreme Court of South Carolina Precedent

*Claytor* is a decision of the Supreme Court of South Carolina, but it did not decide the question before us. The plaintiffs alleged that General Motors defectively designed the lug bolts and failed to warn that continued or excessive pressure on the lug nuts could strip the threads or crack the bolts. *Claytor*, 286 S.E.2d at 130, 132. General Motors' service manual specified that lug nuts should be tightened with approximately 85 pounds of pressure. *Id.* at 132. That specification mattered to the court's warning analysis as an instruction for safe use. *Id.* But it did not supply the basis for the court's defect holding. *See id.* The court did not reason that the lug bolts were nondefective because a user could avoid injury by following the torque specification. *See id.* And the court did not treat the specification as an adequate warning that defeated the separate design defect theory. *See id.*

Instead, the court resolved the plaintiffs' defect and warning theories separately. *See id.* at 130 (stating the two potential jury issues as "(1) was the design of the lug bolts faulty? and (2) was there insufficient warning relative to the effect of overtightening the lug nuts"). As to defect, the court held that the lug bolts were not in a defective condition when they left General Motors' plant and that the later cracking and failure resulted from subsequent mishandling. *Id.* at 131. As to warning, it separately held that a warning that applying excessive force to lug nuts could strip the threads or crack the bolts "simply was not required" because that danger was common knowledge, particularly to an automobile mechanic. *Id.* at 132. *Claytor* therefore may establish that a safe use instruction and an

21

obvious danger can defeat a warning theory, but it did not hold that adequate warnings preclude a design defect claim.[2]

The dissenting opinion confirms that the court treated the design defect and duty to warn theories separately. The dissent understood the plaintiffs to be asserting a design theory based on the strength of the lug bolts and a warning theory based on the absence of a warning against excessive torque. *Id.* at 133–35 (Lewis, C.J., dissenting). On design, the dissent reasoned that the evidence created a jury issue on whether General Motors failed to use a lug bolt of sufficient strength or quality to withstand foreseeable uses. *Id.* at 133–34. On warning, the dissent separately reasoned that the service manual's torque specification did not satisfy the duty to warn because directions for use and warnings of

---

[2] Because *Claytor* resolved the design theory on the ground that the product was not defective when it left General Motors, its broad language about adequate warnings does not control the certified question. Dictum is a "statement in a judicial opinion that could have been deleted without seriously impairing the analytical foundations of the holding— that, being peripheral, may not have received the full and careful consideration of the court that uttered it." *Pittston Co. v. United States*, 199 F.3d 694, 703 (4th Cir. 1999) (quoting *United States v. Crawley*, 837 F.2d 291, 292 (7th Cir. 1988) (Posner, J.)). Those statements "are not binding in future cases that directly raise the questions." *United States v. Norman*, 935 F.3d 232, 241 (4th Cir. 2019). *Claytor* stated that inherently dangerous products "properly prepared, manufactured, packaged and accompanied with adequate warnings and instructions . . . cannot be said to be defective." *Claytor*, 286 S.E.2d at 132. But, as just discussed, *Claytor* did not apply that statement by holding that an adequate warning defeated an otherwise viable design defect claim. *Id.* at 131–32. Nor did the court apply comment j in reaching its result. *See id.* Because the adequate warning statement could have been deleted without impairing the analytical foundation of *Claytor*'s holding, it is arguably dictum. And because dictum is not binding, *Claytor*'s adequate warning language is not controlling precedent on the certified question.

22

danger serve different purposes. *Id*. at 134–35. The dissent's structure reinforces the point that the court addressed design and warning separately.[3] *See id.* at 133–35.

The remaining authorities applying comment j are not controlling precedent from the Supreme Court of South Carolina. *Anderson*, *Allen*, and *Curcio* are decisions of the South Carolina Court of Appeals and are important evidence of South Carolina law, but they are not decisions of the state's highest court. *See Anderson*, 471 S.E.2d at 710 *Allen*, 505 S.E.2d at 359; *Curcio*, 543 S.E.2d at 269. *Hickerson* is a decision of this court and an *Erie* prediction about how the Supreme Court of South Carolina would answer the question, but it is not itself controlling precedent from that court within the meaning of Rule 244(a). *See Hickerson*, 882 F.3d at 484.

### 3. Clearly Insufficient State Law

The *Erie* guess principles discussed above frame the remaining state law inquiry. Under those principles, we must take the South Carolina Court of Appeals decisions and *Hickerson* into account, and we may not disregard them simply because Near offers a different interpretation of South Carolina law. The question is whether those decisions, considered alongside *Claytor*, *Branham*, § 402A, and later products liability developments, permit a confident prediction of how the Supreme Court of South Carolina would answer

---

[3] That distinction is consistent with later products-liability commentary and the Restatement (Third), which treat manufacturing defects, design defects, and warning defects as separate categories even though § 402A stated a single general defect standard. *See* Restatement (Third) of Torts: Products. Liability. § 2 (1998); David G. Owen, *The Puzzle of Comment j*, 55 Hastings L.J. 1377, 1378–80 (2004).

23

the certified question. Our review in Part II.A shows that South Carolina products liability law clearly begins with § 402A and its comments, but the question is whether it ends there.

Indeed, substantial authority supports *Hickerson*'s prediction. South Carolina has adopted § 402A and incorporated its comments as legislative intent. S.C. CODE ANN. § 15-73-30. Comment j states that, when a warning is given, the seller may reasonably assume it will be read and heeded, and a product bearing a warning that makes it safe for use if followed is "not in defective condition, nor is it unreasonably dangerous." Restatement (Second) of Torts § 420A cmt. j. The South Carolina Court of Appeals has applied that language to conclude that adequate warnings may render a product not defective or not unreasonably dangerous. *See, e.g.*, *Anderson*, 471 S.E.2d at 710; *Allen*, 505 S.E.2d at 359; *Curcio*, 543 S.E.2d at 269. *Hickerson* relied on all those authorities and predicted that the Supreme Court of South Carolina would treat adequate warnings as precluding design defect liability. *Hickerson*, 882 F.3d at 484.

But *Branham*—a Supreme Court of South Carolina case that *Hickerson* did not address—creates uncertainty about whether the Supreme Court of South Carolina would apply comment j categorically in a modern design defect case. *See Branham*, 701 S.E.2d at 14–15. *Branham* recognized that the General Assembly adopted § 402A and incorporated its comments as legislative intent. *Id.* But the court did not treat that adoption as freezing South Carolina design defect law in the form reflected in the Second Restatement. *Id.* Instead, the court looked to later developments in products liability law, eschewed the Second Restatement's consumer expectation test as the governing test for design defect claims, and formally adopted the more modern risk utility test for design

24

defect claims. In doing so, the court noted the General Assembly's "foresight in looking to the American Law Institute for guidance" and stated that the General Assembly had "expressed no intention to foreclose court consideration of developments in products liability law." *Id.*

*Claytor* reinforces the concept that the Supreme Court of South Carolina may consider developments in products liability law. Although *Claytor* cited § 402A and its comments, the court did not limit its design defect analysis to consumer expectations. It also considered risk utility factors, including the usefulness and desirability of the product, the cost of added safety, the likelihood and seriousness of injury, and the obviousness of danger. *See Claytor*, 286 S.E.2d at 132. *Claytor* therefore shows that, even shortly after the adoption of § 402A and its comments, the Supreme Court of South Carolina approached design defect as a practical inquiry into product safety, not as a rigid application of every phrase in § 402A's comments.

That practice of considering modern developments in product liability law bears directly on the certified question. Just as later developments in products liability law moved away from the consumer expectations test, later developments in products liability law have also moved away from allowing adequate warnings to preclude design defect claims. *See* Owens, *The Puzzle of Comment j*, 55 Hastings L. J. at 1390–91. In fact, modern products liability law treats design defects and warning defects as distinct theories. *See id.* at 1378–80 (noting manufacturing defects, design defects, and warning defects as three independent theories for product liability claims); Restatement (Third) of Torts: Products Liability § 2 (defining manufacturing defects, design defects, and warning defects

25

as three independent categories of product defects); *Watson v. Ford Motor Co.*, 699 S.E.2d 169, 176 (S.C. 2010) (stating South Carolina state law recognizes three independent theories of product defect: (1) design defect; (2) manufacturing defect; and (3) warning defect). That contrasts with § 402A of the Second Restatement, which provided a single rule of liability for the sale of defective products. *See* Restatement (Second) of Torts § 402A (providing strict products liability for a seller who sells "any product in a defective condition unreasonably dangerous to the user or consumer"). Moreover, the Restatement (Third) explicitly moved away from comment j's categorical approach, stating in its comments that "[w]arnings are not . . . a substitute for the provision of a reasonably safe design." Restatement (Third) of Torts: Products Liability § 2 cmt. l. The Supreme Court of South Carolina could conclude, as it did in *Branham* with the consumer expectations test, that the General Assembly did not foreclose the court's ability to consider these developments in products liability law and depart from comment j.

This does not mean that Near's position on the question at issue is correct. We certify the question because the answer to his question is uncertain. South Carolina law contains a statutory adoption of § 402A and comment j, intermediate appellate decisions applying comment j, and *Hickerson*'s *Erie* prediction on one side. And on the other side, South Carolina law contains the Supreme Court of South Carolina's instruction that § 402A's comments do not necessarily freeze the doctrine of design defect, *Branham*'s adoption of the more modern risk utility test, modern products liability law's separation of

design defects from warning defects, and modern products liability law's trend away from comment j.[4]

*Hickerson* does not remove that uncertainty. To be clear, we may not and are not disregarding *Hickerson*, which remains binding federal precedent unless and until it is displaced by an authoritative statement of South Carolina law. But certification is the mechanism by which a federal court may obtain that authoritative statement when state law is unsettled. *Hickerson* itself recognized that the Supreme Court of South Carolina had not applied comment j to the precise question whether adequate warnings preclude a design defect claim. And although *Branham* predated *Hickerson*, *Hickerson* did not analyze whether *Branham*'s treatment of § 402A's consumer expectations framework provides persuasive evidence that the Supreme Court of South Carolina might also decline to apply comment j categorically in design defect cases. *Hickerson*'s statement that it saw no persuasive data therefore does not foreclose certification when the argument now pressed rests on *Branham*'s reasoning.

Accordingly, we find available state law clearly insufficient to permit a confident *Erie* prediction without certification.

---

[4] A review of district court decisions within this circuit confirms the uncertainty. *Compare, e.g.*, *Alford v. Lowe's Home Ctrs., Inc.*, No. 8:13-cv-1787-BHH, 2014 WL 5305825, at *2 (D.S.C. Oct. 15, 2014) (recognizing the principle as articulated in *Anderson*), *with, e.g.*, *Marshall v. Lowe's Home Ctrs., LLC*, No. 4:14-cv-04585-RBH, 2016 WL 4208090, at *20, n.29 (D.S.C. Aug 10, 2016) (recognizing that design defect and warning defect claims are separate theories, acknowledging that comment j and the South Carolina cases interpreting it may permit an adequate warning to preclude liability for a design defect claim, but rejecting the proposition that a plaintiff must maintain a warning defect claim in order to pursue a design defect claim).

27

## C. Certified Question

Pursuant to Rule 244 of the South Carolina Appellate Court Rules, we respectfully certify the following question of law to the Supreme Court of South Carolina: Do adequate warnings preclude a design defect claim as a matter of South Carolina law?

## III. Exclusion of Grugle's Opinions

We address the exclusion of Grugle's opinions in two steps. First, we summarize the opinions Grugle offered and the district court's reasons for excluding them. Second, we apply Fed. R. Evid. 702, *Daubert*, and the abuse of discretion standard to determine whether the district court reasonably concluded that Grugle's opinions lacked a reliable foundation.

### A. Grugle's Expert Report and the District Court's Opinion

Near offered Grugle as a "human factors" expert, which Grugle herself defined as "the scientific study of how people interact with technology and their environment." J.A. 0442. Her principal opinion was that Enerco's warning system was inadequate because it did not expressly identify the hazard of clothing ignition. *See id.* 0177. To Grugle, the heater's warnings should have told users that clothing could ignite from the heat produced by the heater if a person came within a particular distance of the heater for a particular amount of time, even without direct contact with the heater or its grate. *See id.*

Grugle's report began by summarizing the incident and the heater. *Id.* 158–68. She noted that McCullough, the decedent Belger's nephew, testified that he did not know how close Belger was to the heater or whether Belger's clothes actually touched it. *Id.* 158–62.

28

Grugle then described the MH15T heater and Enerco's product materials. *Id.* 162–68. In doing so, she discussed Enerco's website, product catalog, packaging, hangtag, on-product "HOT" marking, and owner's manual. *Id.* 162. She noted that some marketing photographs showed people wearing long sleeves or jackets in close proximity to the heater. *Id.* 165. She also reproduced or summarized warnings from the packaging, hangtag, and manual, including the manual warning that users should never allow clothing, tents, or other combustible material within thirty inches of the heater face. *Id.* 165–68.

Grugle then turned to human factors principles and the hierarchy of hazard control. *Id.* 169–70. She explained that in her field hazards should be eliminated by design when feasible; if not eliminated, they should be guarded against; and warnings should be used only after design and guarding measures. *Id.* 170. She also discussed warning design principles, relying on general American National Standards Institute (ANSI) warning communication standards for the proposition that warnings should identify the hazard, explain how to avoid it, and state the consequences of failing to comply. *Id.*

From those principles, Grugle concluded that Enerco's warning system was inadequate. *Id.* 171–76. She noted that none of the warnings on the hangtag or in the manual explicitly identified the clothing ignition hazard as it relates to people standing or walking near the heater, as opposed to static combustibles placed near it. *Id.* She also opined that the warnings did not expressly state that clothing could ignite from heat produced by the heater even without contact with the heater or grate, did not identify a specific distance and time at which the hazard would arise, and did not expressly state the consequences of clothing ignition, including burns, serious injury, or death. *Id.* Finally,

29

she noted that Belger did not receive the manual or hangtag warnings and that the only warning he could have seen was the "HOT" marking stamped on the reflector. *Id.*

The district court excluded Grugle's opinions on reliability grounds. *Near*, 2025 WL 1865224, at *4–9. After expressing "serious reservations" about whether Grugle was qualified to give expert testimony on the adequacy of the warnings, the district court identified a series of omissions, that taken together, left Grugle's opinion without a reliable foundation. *Id.* at *6. Specifically, the district court noted that Grugle never saw the subject heater in person, never operated it, never interacted with it, and saw it operate only during a videoconference. *Id.* at *7. The court also noted that she did not conduct any user perception testing, did not offer an alternative warning, could not identify an example of an adequate alternative warning, never felt the heat generated by the heater, could not determine how close a person could get before feeling uncomfortable, had not been provided information about how far from the heater a person could feel infrared heat, did not know what heat a person would feel while wearing cotton pants at any distance from the heater, did not review photographs from this case, did not speak with fact witnesses, did not review Belger's medical records showing the location of his burns, lacked knowledge about clothing ignition testing, was not familiar with the standard to which the heater was certified, had never worked with standards involving clothing ignition tests, and knew nothing about how Belger's clothes ignited. *Id.* at*7–9.

### B. Discussion

We review the exclusion of expert testimony for abuse of discretion. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 139 (1997). "[T]he trial judge must have considerable leeway in

30

deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999).

Under Fed. R. Evid. 702, trial judges act as gatekeepers to "ensure that any and all scientific testimony . . . is not only relevant, but reliable." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993). While "Rule 702 was intended to liberalize the introduction of relevant expert evidence . . . court[s] must recognize that due to the difficulty of evaluating their testimony, expert witnesses have the potential to 'be both powerful and quite misleading.' " *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 261 (4th Cir. 1999) (quoting *Daubert*, 509 U.S. at 595). Therefore, a trial judge, faced with a proffer of expert scientific testimony, must conduct "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592–93. The proponent of the testimony must establish its admissibility by a preponderance of proof. *See id.* at 592 n.10 (citing *Bourjaily v. United States*, 483 U.S. 171, 175–76, (1987)); FED. R. EVID. 702.

To be considered appropriately scientific, the expert need not testify to what is " 'known' to a certainty" but must only state "an inference or assertion . . . derived by the scientific method." *Daubert*, 509 U.S. at 590 (citation omitted). This gatekeeping obligation requires the court to scrutinize not only the principles and methodology used by the expert, but also the expert's application of those principles and methods to the case. *Gen. Elec. Co.*, 522 U.S. at 143; FED. R. EVID. 702(d) (stating that a qualified expert may testify in the form of an opinion if the proponent demonstrates that "the expert's opinion

31

reflects a reliable application of the principles and methods to the facts of the case"); *see also Sardis v. Overhead Door Corp.*, 10 F.4th 268, 289 (4th Cir. 2021) ("The expert must be able to identify and explain those industry testing standards and why the product in question met or failed that test."). To be reliable, the opinion must not have "too great an analytical gap" between the expert's conclusion and the data that allegedly supports it. *Gen. Elec. Co.*, 522 U.S. at 146. "[N]either *Daubert* [n]or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Id.* at 137. In other words, expert opinions must be based on "more than subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 590; *accord Hickerson*, 882 F.3d at 482.

*Hickerson* illustrates the ipse dixit principle in the warnings context. 882 F.3d at 481–83. There, the plaintiff offered an expert who opined that the existing personal watercraft warnings were inadequate in location, content, and form and that alternative warnings would better communicate the danger. *Id.* This court affirmed exclusion of the inadequate-warning opinion because the expert supported it with "no research, data, or scientific theories." *Id.* at 482. The expert had not tested his inadequate-warning opinion and admitted that he had no research showing that users would read and comprehend a warning in the location he preferred more often than the existing warnings. *Id. Hickerson* thus confirms that a warning expert may not simply identify a preferred warning approach and then declare the existing warning inadequate without testing, research, data, or some other reliable basis connecting the opinion to the product and warning system at issue. *See id.*

32

Here, the district court reasonably concluded that Grugle did not connect her theory to objective evidence. In reaching that conclusion, the court did not rely on one methodological omission in isolation. It identified several gaps showing that Grugle did not reliably tie her general human factors principles to this specific case.

Grugle lacked sufficient product specific facts about the heater's operation and warning environment. *See* FED. R. EVID. 702(b) (requiring an expert's testimony to be "based on sufficient facts or data"). Human factors, as Grugle herself described it, concern how people interact with technology and their environment. J.A. 0442. But Grugle herself never saw the heater in person. *Id.* 0439–41. She saw the heater operate only during a videoconference call, which allowed her to see the color of the heater's heating element, the location of its guard, and hear any sounds it makes. *Id.* But the video conference did not allow Grugle to assess the radiant heat a user would experience by standing next to the heater. *Id.*; J.A. 0460. She also admitted that she could not determine how close an individual could get to the heater before their skin would start to feel uncomfortable. J.A. 0440, 0460.

Those missing facts matter because Grugle's opinions concerned what users should know while standing or walking near the heater. Had Grugle operated the heater, stood near it, or otherwise evaluated its operation, she could have assessed facts directly relevant to her opinion. She could have determined whether the heater's radiant heat becomes uncomfortable before a user reaches the zone where clothing ignition becomes plausible. If users could stand in a dangerous zone without appreciable discomfort, that could support a more specific warning. If, by contrast, the heat becomes uncomfortable before the danger

33

point, that could affect the analysis of whether additional language was necessary. These missing facts therefore contributed to the "analytical gap" between Grugle's general human factors principles and her opinion. *Gen. Elec. Co.*, 522 U.S. at 146.

Grugle did not use a reliable method to evaluate warning comprehension, effectiveness, or placement. The existing warnings already conveyed some of the information Grugle said was required: they referred to fire and burn hazards, warned of serious injury and death, instructed users to keep combustible materials away from the heater, and specifically warned users not to allow clothing within thirty inches of the heater's face. *See, e.g.*, J.A. 4815–16. But she did not test whether users who saw the existing warnings understood that clothing should be kept away from the heater. *Id.* 0443–42 (stating in her deposition that she "did not conduct user testing"). She did not test whether users understood the existing references to fire, burn, serious injury, death, combustible materials, and the thirty-inch clearance from the heater's face. *Id.* And she did not test whether an express clothing ignition warning, like she proposes, would improve users' understanding of the hazard. *See id.* 0485 (stating that she "did not provide specific content for a clothing ignition hazard warning for this product"). Instead, she repeated the conclusion that express clothing ignition warnings were needed. *See, e.g.*, *id.* 0481 ("Explicit warnings are needed because in order for a user to accurately understand the nature and scope they have to be informed of what the hazards are [and] the consequences of those hazards."). And although Belger did not receive the manual or hangtag warnings, Grugle did not test or analyze what warning content or location would reach and inform

34

users like Belger.  Like the expert in *Hickerson*, Grugle did not offer any "research, data, or scientific theories" to support her conclusions.  882 F.3d at 482.

Grugle also failed to ground her opinion in comparable products, industry practice, or product-specific standards.  She cited general ANSI warning communication standards for the proposition that warnings should identify the hazard.  J.A. 170.  But those general principles did not answer the case-specific question whether this warning system was inadequate because it did not expressly use the phrase "clothing ignition."  Nor did Grugle compare Enerco's warnings to warnings used on comparable radiant heaters, identify other products using the type of warning she believed was required, or apply the heater-specific standard to explain what this product's warnings should have said.  *See id.* 0450, 0458, 0466, 0482–83.  Those steps were not mandatory, but they illustrate the kind of objective basis that could have supported her opinion.  Without something of that kind, Grugle's opinion rested on assertion rather than analysis.  *See Sardis*, 10 F.4th at 292 ("There must be some objective basis to satisfy the district court that the conclusion reached was the product of reliable principles and methods.").

None of this means that a warnings expert must always inspect the product, operate it, test user perception, test an alternative warning, analyze product-specific standards, review comparable warnings, or reconstruct the incident.  *See Daubert*, 509 U.S. at 594–95.  Rule 702 is flexible.  *Id.*  But flexibility does not eliminate the requirement that the expert reliably connect her principles and methods to the facts of the case.  *See* FED. R. EVID. 702(b)–(d).  Here, the district court reasonably concluded that Grugle did not make that connection.

Accordingly, we hold the district court did not abuse its discretion in excluding Grugle's testimony.

## IV. Summary Judgment

The district court granted summary judgment to Enerco after holding that adequate warnings preclude a design defect claim under South Carolina law, and after finding that Near had not produced admissible evidence from which a reasonable jury could find the heater's warnings inadequate. *Near*, 2025 WL 1865224, at *13–14.

Because the district court's judgment rests on the state law rule we now certify, *see* Part II.B.1, and because the Supreme Court of South Carolina's answer to the certified question may determine whether inadequate warnings can support summary judgment, *see id.*, we defer ruling on the district court's grant of summary judgment pending the Supreme Court of South Carolina's response to our order certifying the question.

## V. Conclusion

As set forth above, we certify a question to the Supreme Court of South Carolina and affirm the district court's *Daubert* ruling on Near's human factors expert Dr. Nancy Grugle. We defer consideration of the district court's summary judgment order pending the Supreme Court of South Carolina's response to our order certifying the question.

*AFFIRMED IN PART AND QUESTION CERTIFIED*

## VI. Certification Order

It is hereby ORDERED:

(1)    That the question set forth herein be certified to the Supreme Court of South Carolina for resolution;

(2)    That the clerk of this court transmit to the Supreme Court of South Carolina, under the official seal of this court, a copy of this order of certification; and

(3)    That the clerk of this court provide the original or copies of all or such portions of the record before this court as may be requested by the Supreme Court of South Carolina, with any and all such requests being effective upon notification by ordinary means from the clerk of the Supreme Court of South Carolina.

This order of certification is entered by Judge Benjamin, with the concurrences of Judge Berner and Judge Gibney.

FOR THE COURT:

A True Copy NWAMAKA ANOWI
Clerk of the United States Court of Appeals
for the Fourth Circuit
Nwamaka Anowi

DeAndrea Gist Benjamin
United States Circuit Judge

37